Steven R. Welk
DENTONS US LLP
4675 MacArthur Court
Suite 1250
Newport Beach, CA 92660
P: (949) 732-3724
F: (949) 732-3739
steven.welk@dentons.com
Admitted *Pro Hac Vice*

Vanessa L. Williams
LAW OFFICE OF VANESSA L.
WILLIAMS, P.C.
414 West Soledad Avenue
GCIC Bldg., Suite 500
Hagatña, Guam 96910
P: (671) 922-5689 | (888) 477-5657
service@vlwilliamslaw.com

*Attorneys for Defendant John D. Walker*

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>   vs.<br><br>JOHN D. WALKER a/k/a JON WALKER,<br>HANSEN HELICOPTERS, INC., ET AL,<br><br>          Defendants. | CRIMINAL CASE NO. 18-00010<br><br><br>**SENTENCING MEMORANDUM FOR DEFENDANT JOHN WALKER** |

# TABLE OF CONTENTS

I. Introduction .................................................................................................. 1

II. Background facts ......................................................................................... 2

III. The Guidelines calculations. ...................................................................... 3

IV. Because the government has not proved any victim sustained actual loss, no adjustment under U.S.S.G. § 2B1.1(b)(1) applies to calculate the offense level for Count 99. .......................................................................................... 3

    A. The PSR incorrectly used gain as a substitute for loss. ......................... 3

        1. Ex Post Facto concerns require the Court to use the 2020 version of the Sentencing Guidelines. ................................................ 4

        2. Because the government did not prove the tuna boat companies sustained any actual loss, gain cannot be used as a substitute for loss. ................................................................................................ 7

        3. Even if the government had proved some actual loss, gain cannot be a substitute for loss because the government has not proved the purported gain approximated the actual loss.................................... 9

        4. Under the Ninth Circuit's interpretation of "gain," it cannot be used as a substitute for loss at all. ....................................... 10

        5. Even if actual loss includes gain, the government did not prove Mr. Walker gained $70 million from the charged conduct.................. 10

            a. The probation officer impermissibly used the amount involved in the Consensual Forfeiture Order as a substitute for a calculation of loss under the sentencing guidelines. .......... 10

        6. The application of a "permeated with fraud" theory to enhance Mr. Walker's sentence is improper...................................... 13

        7. The term "loss" as used in § 2B1.1 unambiguously means actual pecuniary loss, which the government has not proved any victim incurred. . .............................................................................. 13

        8. The government did not prove Mr. Walker purposefully sought to cause the tuna boat operators to lose money.................................... 15

i

V.      Because no victim sustained pecuniary loss, the victim enhancement does not apply......................................................................................................... 16

VI.     The enhancement for sophisticated means does not apply because it is subsumed within the offense conduct. ........................................................ 16

VII.    The enhancement for obstruction of justice does not apply ..................................... 16

VIII.   Mr. Walker's offense level should not be increased for alleged bribes to Philippine officials because the Ninth Circuit has held foreign conduct cannot be used to increase a defendant's sentence. ........................................................... 17

IX.     Mr. Walker's offense level should not be increased under U.S.S.G. § 3E1.1 because he exercised his right to put the government to its burden of proof at trial. ............................................................................................................. 19

X.      Conclusion ............................................................................................................ 20

ii

# TABLE OF AUTHORITIES

**Federal Cases**             **Page(s)**

*Kisor v. Wilke*, 588 U.S. 558 (2019) ...................................................................... 5-6, 15

*Peugh v. United States*, 569 U.S. 530, 544 (2013) .............................................4, 6, 9

*Stinson v. United States*, 508 U.S. 36 (1993) ...................................................... 5-6, 15

*United States v. Abouammo*, 2024 WL 4972564 ..................................................... 9-10

*United States v. Avenatti*, 2024 WL 4553810 (9th Cir. 2024) ...........................7, 10, 12

*United States v. Banks*, 55 F.4th 246 (3d Cir. 2022) ....................................................15

*United States v. Barama*, 2025 WL 303086 (9th Cir. 2025) ................................... 9-10

*United States v. Callisto*, 69 F.4th 648 (9th Cir. 2023) .......................... 5-6, 9, 15, 17

*United States v. Chao Fan Xu*, 706 F.3d 965 (9th Cir. 2013).............................. 18-19

*United States v. Jenkins*, 633 F.3d 788 (9th Cir. 2011) .................................................12

*United States v. Kirilyuk*, 29 F.4th 1128 (9th Cir. 2022) ................................. 14, 16-17

*United States v. McKinney*, 645 F.Supp.3d 709 (E.D. Mich. 2022) ..............................15

*United States v. Rosas-Dominguez*, 724 F. App'x 567 (9th Cir. 2018).........................4

*United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997) .....................................8, 13

*United States v. Tavberidze*, __ F.Supp.3d __, 2025 WL 748354 (S.D.N.Y. Mar. 10, 2025).......19

*United States v. Wijegoonaratna*, 922 F.3d 983 (9th Cir. 2019) ...................................4

**State Cases**

*RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016) ............................18

**Federal Statutes**

15 U.S.C. §§ 78dd01, *et seq*..........................................................................................18

18 U.S.C. § 38(d) ...........................................................................................................12

18 U.S.C. § 982(1)(1) .....................................................................................................12

U.S.S.G. § 1B1.3.............................................................................................................18

U.S.S.G. § 2B1.1.................................................................................................5-9, 14- 16

iii

U.S.S.G. § 2B1.1(b)(1) ................................................................ 5, 7-9, 13-14, 16

U.S.S.G. § 2B1.1(b)(1)(C) ................................................................................ 18

U.S.S.G. § 2B1.1(b)(1)(D) ................................................................................ 18

U.S.S.G. § 2B1.1(b)(2) ....................................................................................... 18

U.S.S.G. § 2B1.1(b)(2)(A)(i) ............................................................................. 16

U.S.S.G. § 2C1.1(b)(1) ...................................................................................... 17

U.S.S.G. § 3C1.1 ........................................................................................... 16-17

U.S.S.G. § 3D1.3(b) .............................................................................................. 3

U.S.S.G. § 3D1.4 ................................................................................................... 3

U.S.S.G. § 3E1.1 ................................................................................................. 19

U.S.S.G. § 3E1.1(b) ........................................................................................... 19

U.S.S.G. § 4B1.2(b) ......................................................................................... 5-6

U.S.S.G. § 5E1.4 ................................................................................................ 12

iv

## I.  Introduction

The PSR incorrectly calculates the sentencing guidelines in this case – which are driven by the wire fraud conspiracy alleged in Count 99 – in several respects.  First, the PSR applies a $70 million loss figure based on the theory that the Consent Order of Forfeiture represents the amount of gain Mr. Walker derived from the wire fraud.  This conclusion is both legally and factually incorrect.  The PSR incorrectly used gain as a substitute for loss even though the government did not prove the tuna boat companies that the government claims were the victims of the wire fraud lost any money, let alone $70 million.  In fact, the government's evidence showed the exact opposite – the tuna boats continued to renew their contracts for Hansen's helicopters year after year, showing they were satisfied with the value of the service they were provided.  Nor did the government prove Mr. Walker purposefully intended to cause the tuna boats to lose money, even if intended loss were a theory available to show loss, which it is not.

The PSR also incorrectly double-counts the amount of money Mr. Walker agreed to forfeit by ignoring the fact that the $11 million that was forfeited under the money laundering statutes was the same as the funds forfeited under the wire fraud statute, as the Consent Forfeiture Order clearly states.

The PSR erroneously includes an enhancement for 10 or more victims based on the number of tuna boats that signed contracts for Hansen's helicopters.  However, a "victim" under the Guidelines must have sustained actual loss as a result of the defendant's conduct, something the government did not prove and the PSR did not find.

The PSR's imposition of a sophisticated means enhancement engages in improper double-counting.  The conduct it cites in support of this enhancement – the receipt of wire transfers for the payment of helicopter services – is the same as the conduct underlying the wire fraud conviction.

The PSR also incorrectly enhanced the sentence for obstruction of justice even though the conduct on which the enhancement was based was performed by Messrs. Crowe and Kapp, not Mr. Walker.  The obstruction guideline does not provide for vicarious liability, and the commentary that purports to expand the guideline's application to this conduct is an impermissible policy enactment that must be disregarded.

///

1

## II.     Background facts

Mr. Walker is from Missouri, where he has lived for most of his life.  He grew up in Neosho, in the southwestern part of the state on the western edge of the Ozarks, where he has owned a successful hay and cattle farm for decades.  He is also a gifted pilot and began working as a helicopter pilot and mechanic for Hansen Helicopters in the 1990s eventually buying the company in 2001.  In 2011, Mr. Walker stepped away from Hansen to focus on his Missouri farm, leaving the operation of the helicopter business to Rufus Crowe and Phillip Kapp, among others, who oversaw day-to-day operations and accounting of the business thereafter.  The evidence at trial clearly demonstrated that Mr. Crowe and Mr. Kapp were primarily responsible for operating the helicopter business after 2011.

Hansen was a tuna spotting business headquartered in Guam that leased helicopters to commercial fishing vessels operating in international waters in the South Pacific.  Tuna spotting is an inherently dangerous business, involving a pilot and spotter taking off from a tuna boat on the high seas, locating large schools of tuna, and then directing the tuna boat to the fish before landing on the deck of the vessel.  As is common in the industry, Hansen owned 36 subsidiary corporate entities (the "CEs"), most of which were incorporated in offshore jurisdictions to hold title to the leased helicopters or handle other administrative aspects of the business.  The tuna boat operators who leased the helicopters were provided pilots and mechanics to fly and care for the aircraft while at sea, and many of them did business with Hansen for many years, demonstrating that they were satisfied with the goods and services for which they contracted.

Although Mr. Walker continued to own Hansen Helicopters after 2011, he did not have a role in the day-to-day management of the company and did not actively monitor its activities.  Mr. Crowe and Mr. Kapp were the ones making the decisions for the company and did so mostly without direction or advice from Mr. Walker, who had returned to Missouri.  He was a hands-off

2

owner running his separate, unrelated agricultural business. There was no evidence that Mr. Walker personally engaged in or directed any conduct that could reasonably be characterized as obstructing justice or government investigations.

### III. The Guidelines calculations.

The PSR found a total offense level of 41 based on the finding that all of the offenses constituted a single group and applying the highest offense level as the total offense level for all counts. Dkt. 2260 at p. 47, ¶¶ 217, 220 (citing U.S.S.G. §§ 3D1.3(b) and 3D1.4).

The PSR attributed the highest offense level of 41 to Count 99, Conspiracy to Commit Wire Fraud. Dkt. 2260 at p. 45, ¶ 195. The PSR calculated that offense level under § 2B1.1 as follows:

| | |
|---|---|
| Base Offense Level: § 2B1.1(a)(1) | 7 |
| Amount of Gain: § 2B1.1(b)(1)(M) | +24 |
| 10 or more Victims: § 2B1.1(b)(2) | +2 |
| Sophisticated Means: § 2B1.1(b)(10) | +2 |
| Organizer or leader: § 3B1.1(a) | +4 |
| Obstruction of Justice § 3C1.1 | +2 |
| Adjusted Offense Level | 41 |

As discussed below, this guideline calculation is incorrect.

### IV. Because the government has not proved any victim sustained actual loss, no adjustment under U.S.S.G. § 2B1.1(b)(1) applies to calculate the offense level for Count 99.

#### A. The PSR incorrectly used gain as a substitute for loss.

In calculating the guidelines for Count 99, the PSR incorrectly increased the base offense level by 24 points by mistakenly finding that Mr. Walker admitted in the Consent Forfeiture Order to receiving $70,177,513 in "proceeds" from his "various criminal schemes" and erroneously using

3

this amount of purported "gain" as a substitute for loss.  PSR p. 44, ¶ 189.   As discussed below, there are numerous errors in this calculation.

First, the Ex Post Facto Clause required the use of the November 1, 2020 Guidelines instead of the November 1, 2024 Guidelines used in the PSR.  Second, because the government did not prove the tuna boat companies sustained any actual loss as a result of the wire fraud conspiracy charged in Count 99, gain cannot be used as a substitute for loss.  Third, even if the government had proved some actual loss, gain cannot be a substitute for loss unless the government proved the purported gain approximated the actual loss, which it did not do.  Fourth, the Ninth Circuit has interpreted the pre-2024 definition of "gain" in the commentary to § 2B1.1 such that it cannot be used as a substitute for loss.  Fifth, even if gain could be used as a substitute for loss, the PSR incorrectly double-counted over $11 million included in the Consent Forfeiture Order and improperly equated forfeited funds with the profits gained from the offenses.  Sixth, the term "loss" is not ambiguous and means only actual losses which the government here has not proved any victim incurred.   Seventh, even if intended loss were included in the definition of "loss," the government has not proved Mr. Walker purposefully sought to cause the tuna boat companies to lose money.

1. Ex Post Facto concerns require the Court to use the 2020 version of the Sentencing Guidelines.

The Court is required to use the version of the Sentencing Guidelines in effect at the time of sentencing unless an earlier version of the Guidelines applicable at the time the charged offenses were completed results in a lesser sentence.  *Peugh v. United States*, 569 U.S. 530, 544 (2013); *United States v. Wijegoonaratna*, 922 F.3d 983, 992-93 (9th Cir. 2019).  If the Court determines an earlier version of the Guidelines should be used, that version must be used in its entirety to calculate the applicable guidelines.  *United States v. Rosas-Dominguez*, 724 F. App'x 567, 569 (9th Cir. 2018).

In this case, the PSR used the Guideline manual in effect on November 1, 2024.  PSR p. 36 ¶ 119.  However, the 2024 Guidelines contain an amendment to § 2B1.1 that moves the definition of "loss" from the commentary to the guideline itself.  *Compare* U.S.S.G. § 2B1.1(b)(1), App. N. 3(A) & (B) (2020 ed.)  *with* U.S.S.G. § 2B1.1(b)(1) Notes to Table (2024 ed.).   This change is consequential because in *United States v. Castillo*, the Ninth Circuit held that "[t]he more demanding deference standard articulated in *Kisor* [*v. Wilke*, 588 U.S. 558 (2019)] applies to the Guidelines' commentary" and replaces the previous rule established by *Stinson v. United States*, 508 U.S. 36 (1993) that required courts to give the Guidelines' commentary "controlling weight unless it is plainly erroneous or inconsistent with the regulation."  69 F.4th 648, 655 (9th Cir. 2023).

Under the *Kisor* framework, the court must first determine if the applicable guideline itself is "genuinely ambiguous."  *Castillo*, 69 F.4th at 655.  If it is not, the court cannot defer to the commentary but must apply the unambiguous text of the guideline itself to the case before it.  *Id.* at 662-63 ("Because we find that § 4B1.2(b)'s definition of 'controlled substance offense' is unambiguous, the Supreme Court's decision in *Kisor* now makes it impermissible to defer to Application Note 1 to determine whether conspiracy fits into this definition.").  To determine whether a guideline is genuinely ambiguous, the court "must exhaust all the 'traditional tools' of construction." *Id.* at 655, quoting *Kisor*, 139 S. Ct. at 2415.  The court must then analyze whether the agency's interpretation is "reasonable" in that "it must come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Kisor*, 588 U.S. at 575-76.  Even then, "not all reasonable agency constructions of those truly ambiguous rules are entitled to deference." *Castillo*, 69 F.4th at 655.

Applying this framework, the Ninth Circuit held that the commentary to the career offender

5

guideline § 4B1.2(b) improperly expanded the definition of "controlled substance offense" to include conspiracies and attempts where those inchoate offenses were not included in the definition set out in the guideline itself. *Id*. at 653. In reaching this conclusion, the Ninth Circuit found *Kisor* "is an intervening decision of a higher authority that is clearly irreconcilable" with the court's prior cases interpreting the Guidelines' commentary under the more deferential *Stinson* standard and overruled prior cases that relied on the commentary to interpret § 4B1.2(b). *Castillo*, 69 F.4th at 656.

As a result, the authoritative nature of Commission's definition of the term "loss" under § 2B1.1 differs depending on whether that definition is included in the commentary, as it was prior to 2024, or in the guideline itself, as it was beginning on November 1, 2024. Prior to the 2024 amendments, a court could only defer to the Commission's loss definitions if it first found the term "loss" as used in § 2B1.1 is ambiguous and, next, that the definition contained in the Commission's commentary is a reasonable interpretation of that ambiguity.

As demonstrated by *Castillo* itself, the Ninth Circuit has concluded that the Commission's definitions are not always reasonable interpretations of the guidelines to which they apply. Indeed, as discussed further below, the Ninth Circuit has concluded the Commission's use of the term "gain" in the Commentary to § 2B1.1 is not always a reasonable interpretation of the term "loss" as used in that guideline. As discussed below, whether "gain" can be substituted for "loss" and what amounts can be included as "gain" under § 2B1.1 are affected by whether the term "gain" is included in the commentary or the guideline. Because Mr. Walker's sentence would be lower under the former scenario, the Court must use the pre-2024 Guidelines when calculating the applicable Guidelines range. *Peugh*, 569 U.S. at 544.

The Second Superseding Indictment was returned on January 8, 2021. Therefore, the

6

November 1, 2020 version of the Guidelines was in effect at the time of the charged offenses and should be used to determine the applicable Guidelines.  Further references to the "Guidelines" or to a particular guideline are to the Guidelines effective November 1, 2020 unless otherwise specified.

2. <u>Because the government did not prove the tuna boat companies sustained any actual loss, gain cannot be used as a substitute for loss.</u>

The Guidelines permit the use of "gain" as a substitute for "loss" "only if there is a loss." *See* U.S.S.G. § 2B1.1, App. N. 3(B); *see also* U.S.S.G. § 2B1.1(b)(1) Notes to Table (B) (Nov. 1, 2024 ed.); PSR at p. 44 ¶ 189.  Here, the government has not proved that any of the tuna boat companies it contends were the victims of Count 99 sustained any loss because it has not shown they did not receive the full value of the services for which they contracted.

For Guidelines purposes, "loss" is limited only to "pecuniary harm," that is "harm that is monetary or that otherwise is readily measurable in money" and does not include non-economic harm, such as harm to reputation or emotional distress.  U.S.S.G. § 2B1.1, App. N. 3(A)(i), (iii).  Where the government has not proved that a monetary loss occurred, gain cannot be used to increase the base offense level under § 2B1.1(b)(1).

Importantly, when calculating the value of loss based on fraud in the provision of goods or services, the fair market value of any goods provided or services rendered must be deducted from the amount the purported victim paid to arrive at the loss amount under § 2B1.1.  In *United States v. Avenatti*, 2024 WL 4553810 (9th Cir. 2024), the Ninth Circuit recently reversed the defendant's sentence where the district court failed to deduct the fair market value of services rendered by the defendant to the victims of the charged fraud.  The Circuit found that to do otherwise would enhance the defendant's sentence "based on pecuniary harm that did not occur, and did not result from [the] offense," which is "contrary to the purpose of the loss enhancement, which is to ensure

7

that a defendant's sentence is proportional to the harm he caused." *Id*. at *1 (brackets omitted).

It is undisputed the tuna boat operators received helicopters, pilots, and mechanics for each of the leases and that those helicopters were used for tuna spotting as the contracts provided. Because the tuna boats were provided the services for which they contracted – helicopters and personnel for fish spotting – any purported loss must be reduced by the value of the services the tuna boats actually received. *See United States v. Rutgard*, 116 F.3d 1270, 1294 (9th Cir. 1997) ("We have held that where misrepresented grapes were delivered the fraudulent broker must still be given credit for the value of the grapes he did deliver.")

The government has not contended, nor could it, that the tuna boat operators received no value at all for the services they were provided. Indeed, the evidence is to the contrary. The government contends, and the evidence shows, that the operators continued to sign new contracts with Mr. Walker's companies for two decades. Furthermore, no tuna boat company has submitted a victim impact statement claiming loss (PSR p. 35 ¶ 118), nor did the government call any tuna boat operator testify at trial as to any loss it may have incurred. Thus, the government has not proved that the tuna boat companies were dissatisfied with the services they contracted for or did not receive the full value of what they paid for.

Under the Guidelines, gain cannot be used as a substitute for loss unless the government first proves that a loss occurred. U.S.S.G. § 2B1.1, App. N. 3(B). The PSR correctly cites to this provision but fails to find the government proved the tuna boat companies sustained loss in the form of pecuniary harm that resulted from the charged wire fraud. PSR p. 44 ¶ 189. Because the government did not prove this essential fact, gain cannot be used as a substitute for loss, and the PSR incorrectly increased the offense level by 24 points. Instead, no increase should be applied under § 2B1.1(b)(1) to the base offense level of 7.

3. Even if the government had proved some actual loss, gain cannot be a substitute for loss because the government has not proved the purported gain approximated the actual loss.

Even if the government had proved the tuna boat companies suffered some form of monetary loss due to the charged wire fraud, which it did not, the $70 million in "gain" cited in the PSR cannot be used as substitute for loss unless the government also proves this amount is a reasonable approximation of the tuna boat's loss. In other words, it is not sufficient for the government to prove the tuna boat companies suffered some loss, no matter how small or undefined. The government must prove the tuna boat companies suffered approximately $70 million worth of loss in order to substitute this amount of gain for loss under § 2B1.1.

In two recent unpublished cases, the Ninth Circuit held that, under the pre-2024 Guidelines,[1] the term "loss" in § 2B1.1(b)(1) does not "allow for a 'gain' that does not approximate the victim's loss." *United States v. Barama* 2025 WL 303086, *3 (9th Cir. 2025); *see also United States v. Abouammo*, 2024 WL 4972564, *2 (9th Cir. 2024) ("Applying *Castillo*, whatever the full scope of the word 'loss' in former U.S.S.G. § 2B1.1(b)(1) may be, that term at the very least cannot mean 'gain' that does not purport to approximate a victim's 'loss.'"). As a result, in order to use gain as a substitute for loss, the government is required to prove, first, that a loss occurred, and, second, that the purported gain reasonably approximates that loss. *Barama* 2025 WL 303086 at*3.

Here, the PSR does not find that any actual loss occurred, nor does it explain how the $70 million in purported gain from the Consent Forfeiture Order reasonably approximates that loss. PSR p. 44, ¶ 189. In fact, as discussed further below, the Ninth Circuit has consistently held that

---

[1] In both cases, the Ninth Circuit applied the principles it announced in *Castillo* to interpret "loss" in light of the non-binding nature of the definitions that were included in Application Note 3 to § 2B1.1. As discussed above, because the Commission's 2024 amendment moving those definitions out of the commentary and into § 2B1.1 would change this analysis to Mr. Walker's detriment, the Court must use the pre-2024 Guidelines to determine his sentence so as to avoid Ex Post Facto concerns. *Peugh*, 569 U.S. at 544.

9

it is error for a sentencing court to use funds subject to forfeiture as a measure of loss under § 2B1.1 of the Sentencing Guidelines. *Avenatti*, 2024 WL 4553810 at *1 (forfeiture "has no place in calculating 'actual loss' for the purposes of enhancing a criminal defendant's sentence"). Because the government has not proved the purported "gain" to Mr. Walker – of $70 million or any other amount – approximates any loss the tuna boat companies may have incurred, gain cannot be used as a substitute for loss in this case.

4. Under the Ninth Circuit's interpretation of "gain," it cannot be used as a substitute for loss at all.

The Ninth Circuit's holding that the definition of "loss" in the pre-2024 Guidelines cannot be stretched to mean a "gain that does not purport to approximate the victim's loss" renders the substitution of "gain" for "loss" untenable under the Guidelines themselves. Application Note 3(B) expressly states that gain can be used as a substitute for loss "only if there is a loss *but it reasonably cannot be determined*" (emphasis added). Thus, according to the Guideline commentary, gain cannot be used if the loss can be reasonably determined. On the other hand, the Ninth Circuit concluded in *Abouammo* and *Barama* that gain cannot be used *unless* it reasonably approximates the loss – meaning the loss must be "reasonably determined" before the gain can be used. However, if the loss is "reasonably determined," as *Abouammo* and *Barama* require, the Guideline commentary states gain cannot be used as a substitute for loss.

The Ninth Circuit has not addressed the impact of its holdings in *Abouammo* and *Barama* on the text of Application Note 3(B). However, it is clear that the limitations the Ninth Circuit has placed on the definition of "gain" abrogate its use as a substitute for loss in cases applying the Guidelines as they existed before the 2024 amendments.

5. Even if actual loss includes gain, the government did not prove Mr. Walker gained $70 million from the charged conduct.

a. The probation officer impermissibly used the amount involved in the Consensual Forfeiture Order as a substitute for a calculation of loss under the sentencing guidelines.

10

Paragraph 46 of the PSR notes the January 31, 2025 entry of the Consent Forfeiture Order in which Mr. Walker agreed to the entry of forfeiture money judgments in the amount of $58,407,513 in connection with the convictions for Counts 8-11 and Counts 99-104, and $11,770,000 in connection with Counts 105-110.  However, the Order explicitly provides that the total amount to be collected is the $58 million figure, to avoid double-counting.  ECF at 3, 4.  This was necessary because under the government's various forfeiture theories, the $11 million attributable to Counts 105-110 was already included in the larger figure.  Further, the $11 million itself already includes double-counting.  The total value of the money involved in the transfers described in the money laundering counts is only $6,700,000, because most of the funds were transferred twice.[2]  In any event, Mr. Walker only agreed to forfeit $58 million in the Consent Forfeiture Order, not the $70 million the PSR mistakenly found.

Critically, the Consent Forfeiture Order did not include any agreement or admission that the money judgments could or would act as a substitute for any other aspect of sentencing, including the proper calculation of loss under the Guidelines.  Indeed, one week after the entry of the Order, the government argued in its objection to the Draft PSR not only that the Guidelines had not been properly applied, but that the loss amount for sentencing purposes exceeded $250,000,000 – nearly five times the amount of the money judgment[3] in the January Consent Order.  *See* ECF 2224 at 5.

Nevertheless, based entirely on that Order, the probation officer concluded that Count 99

---

[2] Count 105 charged a December 14, 2016 transfer of $3,000,000.00 from Bank of Hawai`i 9134 to Bank of Hawai`i 3534; Count 106 charged a December 15, 2016 transfer of $3,000,000.00, also from Bank of Hawai`i 9134 to Bank of Hawai`i 3534; Count 109 charged a December 19, 2016 transfer of $2,500,000.00 from Bank of Hawai`i 3534 to Community Bank and Trust 4056; and Count 110 charged a December 20, 2016 transfer of $2,500,000.00 from Bank of Hawai`i 3534 to Community Bank and Trust 4056.

[3] As noted above, the amount of the effective judgment entered in the January Consent Order is not $70,177,153, it is $58,407,513.

11

"involved over $65,000,000 in fraudulently obtained proceeds," and went on to state that the January Consent Order reflects "$70,177,153 in illegally obtained proceeds" relating to Count 99. ECF 2260-1 at 4. In addition to the fact that neither of these statements is factually correct, the inclusion of the numbers provide a vivid demonstration why forfeiture orders cannot take the place of guidelines loss calculation, since the effect of the inclusion was enormous, increasing the recommended guideline sentence from level 12 (in the Draft PSR) to level 41, and quadrupling Mr. Walker's potential sentence without the benefit of any of the calculations mandated by the Guidelines.

There is no authority for the proposition that a defendant's agreement to forfeit a set amount can be used as a substitute for determining loss under the Guidelines. *See Avenatti*, 2024 WL 4553810 at *1 (forfeiture "has no place in calculating 'actual loss' for the purposes of enhancing a criminal defendant's sentence"). Calculating loss is "highly individualized and fact specific" in ways that statutory forfeiture determinations are not, which is why the guidelines "offer several possible approaches" (*United States v. Jenkins*, 633 F.3d 788, 808 (9th Cir. 2011)), none of which were followed here. Forfeiture orders are calculated and entered pursuant to statutes entirely separate from the Guidelines, and the sentencing commission left no room for misunderstanding by including a section specifically excluding forfeiture determinations from the Guidelines. *See,* U.S.S.G. § 5E1.4 ("Forfeiture is imposed upon a convicted defendant as provided by statute."). The forfeiture statutes invoked by the government here provided for the forfeiture not only of proceeds of the offenses of certain of the convictions, but amounts reflecting the value of property used or intended to be used to facilitate the violations (*see* 18 U.S.C. § 38(d)) and property involved in other violations (*see* 18 U.S.C. 982(a)(1)). The factors for determining loss for sentencing purposes are found in the Guidelines and are substantively separate determinations.

By lifting figures from the January Consent Order and inserting them into the PSR, apparently in response to the government's objection (*see* 2260-1 at 1,4), the probation officer completely bypassed the analysis mandated by the Guidelines, and then compounded the error by engaging in the double-counting explicitly barred by the plain language of the Consent Order. Of greatest consequence, however, is that the erroneous insertion of the forfeiture money judgment as the loss amount caused an enormous increase in the recommended sentence.

6. <u>The application of a "permeated with fraud" theory to enhance Mr. Walker's sentence is improper.</u>

Mr. Walker anticipates that the government will argue that because Hansen Helicopters was "permeated with fraud," all of its earnings constitute "loss" within the meaning of the Guidelines  To the extent the government uses this terminology to justify a loss calculation that includes the gross earnings of Hansen for the entirety of its existence, the mandatory applicable authority forbids it. The term "'permeated with fraud' is a conclusion that that is too indefinite to sustain a criminal conviction absent specific supporting evidence," especially where it leads to a significant increase in the Guidelines level. *Rutgard*, 116 F.3d at 1294. "It is also too indefinite and uncertain to a sentence." *Id.*

The *Rutgard* Court noted that while evidentiary burdens at sentencing are relaxed, they are not non-existent, and " a global permeated with fraud conclusion is not a judgment based on specific evidence," particularly in light of the fact that where a business is found to have provided legitimate goods or services – as is the case here – credit must be given for those goods and services. *Id.*

7. <u>The term "loss" as used in § 2B1.1 unambiguously means actual pecuniary loss, which the government has not proved any victim incurred.</u>

The term "loss" in § 2B1.1(b)(1) unambiguously means the actual pecuniary harm a victim suffered as a result of the defendant's conduct. Thus, "loss" means the money the government

proved the tuna boat operators lost because the helicopters, pilots, and mechanics they contracted for were not properly registered with the FAA, as that is the wire fraud the government charged and the jury found. Because the government did not prove the operators lost any money due to this conduct, it has not proved there was any "loss" under § 2B1.1(b)(1), and Mr. Walker's guidelines' range should not be increased by any levels under that provision.

Application Note 3 to § 2B1.1 purports to expand the definition of "loss" to include not only "actual loss" but also "intended loss" and "gain." U.S.S.G. § 2B1.1, App. N. 3(A)(ii), (B). As discussed above, the Ninth Circuit has held that "loss" is not so ambiguous that it can be stretched to mean a "gain" that does not reasonably approximate the actual loss. The government has not proved that any gain to Mr. Walker approximates any loss suffered by the tuna boat companies. Therefore, gain cannot be substituted for loss in this case.

While the Ninth Circuit has not addressed the issue, it follows that the term "loss" similarly cannot be stretched to include loss that is merely "intended" but did not actually occur. In *United States v. Kirilyuk*, the Ninth Circuit analyzed a different provision of § 2B1.1's commentary and held that because the application of an automatic loss amount of $500 for each stolen credit card was inconsistent with the plain meaning of the term "loss" as used in § 2B1.1(b)(1), it did not apply. 29 F.4th 1128, 1136-37 (9th Cir. 2022). In so holding, the Circuit noted it has "been 'troubled' by the Commission's prior attempts to use its interpretive authority to improperly change the scope of a Guideline provision." *Id*. The Court concluded that the commentary must "interpret the guidelines, not contradict or add to them," and that where the commentary "doesn't illuminate the meaning of 'loss' but modifies it," it should not be followed. *Kirilyuk*, 29 F.4th at 1138 ("[T]he role of the Application Notes is to explain the Guidelines, not enact policy changes to them.").

The Court reached this conclusion even though it was applying the more deferential standard applicable under *Stinson*, rather than "the narrower deference set out in *Kisor*." *Id.* at 1139 (9th Cir. 2022). As the Ninth Circuit has now made clear, it is this "narrower" deference from *Kisor* that applies to analysis the Guidelines' commentary. *Castillo*, 69 F.4th at 655. Under that analysis, the term "loss" cannot be stretched to include losses that were only "intended" but did not materialize. *See Untied States v. Banks*, 55 F.4th 246, 253 (3d Cir. 2022) (applying *Kisor* to conclude "in the context of a sentence enhancement for basic economic offenses, the ordinary meaning of the word 'loss' is the loss the victim actually suffered" and the commentary "improperly expands" the definition to include intended loss); *United States v. McKinney*, 645 F.Supp.3d 709, 718 (E.D. Mich. 2022) (concluding "the use of the term 'loss' in the guideline itself is unambiguous and means only actual, real, materialized harm" such that "inserting the word 'intended' before the word 'loss' changes the meaning of 'loss' in a way that departs from its plain meaning.") Indeed, the fact that the Commission reacted to the courts' determination that, when applying *Kisor's* analysis, "loss" could not be interpreted to include "intended loss" or "gain" by moving those definitions into the guideline itself supports the view that "the commentary improperly expanded the Guidelines' plain language." *Castillo*, 69 F.4th at 663 n.7. Thus, intended loss cannot be used to increase Mr. Walker's offense level.

8. <u>The government did not prove Mr. Walker purposefully sought to cause the tuna boat operators to lose money.</u>

Even if intended loss could be used, which it cannot, the government has not proved Mr. Walker "purposefully sought to inflict" "pecuniary harm" on the tuna boat companies by failing to properly register helicopters, pilots, and mechanics with the FAA. U.S.S.G. § 2B1.1, App. N. 3(A)(ii). The government did not prove that any tuna boat company did not receive the helicopters, pilots, and mechanics for which it contracted or that any company was dissatisfied with the services

15

it received. The evidence shows the contrary – the tuna boat companies were repeat customers who continued to enlist Hansen's services for years, showing they had received their money's worth. As the Ninth Circuit has held, "§ 2B1.1 is driven by the amount of loss *caused by the crime*." *United States v. Kirilyuk*, 29 F.4th 1128, 1137 (9th Cir. 2022) (emphasis in original, quotation omitted). The government has not proved that any tuna boat company suffered any loss as a result of the wire fraud charged in Count 99, nor that Mr. Walker intended for any loss to occur.

**V.      Because no victim sustained pecuniary loss, the victim enhancement does not apply.**

For purposes of the enhancement for 10 or more victims found in U.S.S.G. § 2B1.1(b)(2)(A)(i), a "victim" is a person who sustained "actual loss" as that term is defined in U.S.S.G. § 2B1.1(b)(1). The Commentary's expansion of "loss" to include "intended loss" or "gain" does not apply to this enhancement. As discussed above, Count 99 did not involve "actual loss" to any victims, nor did the PSR find that it did. Therefore, the government has not proved the victim enhancement applies.

**VI.      The enhancement for sophisticated means does not apply because it is subsumed within the offense conduct.**

The PSR applied a two level enhancement for "sophisticated means" because "numerous shell corporations . . . received, through wire transfers, payments from the lease of fraudulent helicopters." PSR p. 45 ¶ 191. However, this is precisely the conduct for which Mr. Walker was charged in Count 99 of the indictment. Mr. Walker's sentencing guidelines cannot be increased for conduct that is subsumed within the offense itself. The PSR's double-counting is incorrect.

**VII.      The enhancement for obstruction of justice does not apply**

The obstruction enhancement under U.S.S.G. § 3C1.1 applies only where Mr. Walker personally engaged in obstructive conduct. The commentary purports to expand the guideline to include situations where the defendant aided and abetted another person to commit obstructive acts

16

(U.S.S.G. § 3C1.1 App. N. 9). However, rather than being a reasonable interpretation of the guideline, this commentary impermissibly expands it by adding vicarious liability that is not included in the guideline itself. Because that expansion conflicts with the guideline's plain text, it is not authoritative and must be disregarded. *See Castillo*, 69 F.4th at 662-63; *Kirilyuk*, 29 F.4th at 1138 ("[T]he role of the Application Notes is to explain the Guidelines, not enact policy changes to them."). Therefore, Mr. Walker should only be held accountable for obstructive acts in which the government has proved he personally engaged.

Even if that were not the case, no obstruction charges were filed in this case, obstruction was not an object of the charged conspiracy, and the government has not proved Mr. Walker knew about the purported obstructive conduct or had anything to do with it, let alone counseled, commanded, or procured it.

The PSR simply states that "upon investigation" Mr. Walker provided "numerous false documents to the Government" and that he covered up evidence of a fraud by intentionally sinking aircraft to avoid detection. PSR p. 45 ¶ 194. However, the government has not proved that Mr. Walker provided false documents to the government or destroyed evidence by sinking helicopters to thwart an NTSB investigation. The PSR's description of this conduct finds that Messrs. Crowe and Kapp engaged in this conduct, not Mr. Walker. The government has not proved that Mr. Walker knew about these acts or commanded, aided and abetted, or procured them.

**VIII.    Mr. Walker's offense level should not be increased for alleged bribes to Philippine officials because the Ninth Circuit has held foreign conduct cannot be used to increase a defendant's sentence.**

The PSR imposes a four-level increase for counts 1 and 105-110 based on a bribe to receive Philippine airworthiness certificates. PSR pp. 17 ¶ 89, 37 ¶¶ 125-26, 46 ¶¶ 209-10. First, the PSR imposed a 2-level increase under § 2C1.1(b)(1) for the offense involving two or more bribes based on one bribe to FAA inspector Cislo and a second bribe to unknown Philippine aviation inspectors.

17

PSR pp. 37 ¶ 125, 46 ¶ 209.  Second, the PSR imposed a 6-level increase under § 2B1.1(b)(1)(D) and (b)(2) (2004 ed.) for a loss amount of greater than $40,000, calculated by adding the $22,500 bribe to FAA Inspector Cislo and the $18,000 purported bribe to the unknown Philippine inspectors for a total of $40,500.  PSR p. 37 ¶¶ 126, 46 ¶ 210.  Without inclusion of the Philippine bribes, Mr. Walker's offense level for those counts would decrease by four levels because the 2-level increase for more than one bribe would not apply and the loss-amount for the bribes would include only the $22,500 bribe to Inspector Cislo, resulting in a 4-level increase for loss of between $15,000 and $40,000 under § 2B1.1(b)(1)(C), rather than the 6-level increase the PSR imposes.

The PSR incorrectly included the Philippine bribes in its calculation of the relevant guidelines.  The indictment did not allege honest services fraud as to the Philippine inspectors. Nor was the Philippine bribery charged as an object of count one, which alleged a conspiracy to defraud the United States through concealing and misrepresenting material facts to the FAA and NTSB, or as part of the money laundering charged in counts 105-110.  The indictment is utterly devoid of any reference to the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, et seq., the statute under which foreign bribery would be charged.  Therefore, the Philippine bribes could only be pertinent to the Guidelines' calculations as relevant conduct under § 1B1.3.

However, the Ninth Circuit has made it clear that it is procedural error for a court to rely on foreign conduct to increase a defendant's sentence.  *See United States v. Chao Fan Xu,* 706 F.3d 965, 992 (9th Cir. 2013) ("applying the relevant conduct analysis to Defendants' foreign conduct is not permissible"), *abrogated on other grounds by RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016).  The Ninth Circuit reached that conclusion in *Chao Fan Xu* even though the defendants' acts in China would have been a crime under both Chinese and American law, explaining that "it is easy to contemplate scenarios where a comparison of foreign

18

and domestic law is not so clear cut." *Id*. at 992-93. So too here, the purported bribes to Philippine officials, even if they were crimes in the Philippines, cannot support an increase to the sentencing guidelines for counts that charged domestic offenses.

The PSR incorrectly increased the offense level for counts 1 and 105-110 for foreign bribery that was not the object of any of the charged offenses. As a result, the offense level for those counts should be reduced by four-levels.

IX. **Mr. Walker's offense level should not be increased under U.S.S.G. § 3E1.1 because he exercised his right to put the government to its burden of proof at trial.**

The PSR does not afford Mr. Walker any adjustment for acceptance of responsibility under § 3E1.1. PSR p. 47 ¶ 218. The increase in his offense level by three points solely because he put the government to its burden of proof at trial is an unconstitutional penalty imposed on Mr. Walker's Sixth Amendment right to trial. *See United States v. Tavberidze,* __ F.Supp.3d __, 2025 WL 748354 (S.D.N.Y. Mar. 10, 2025). Because virtually all defendants who are charged with federal crimes choose to enter guilty pleas, only those who exercise their Sixth Amendment right to trial suffer the three-point increase in offense level under § 3E1.1. *Id*. at *4 ("[S]ection 3E1.1 in its entirety effectively penalizes a defendant who, whether innocent or guilty, proceeds to trial based on his decision to exercise his Sith Amendment right to trial.")

In particular, § 3E1.1(b) increases a defendant's sentence by one point entirely because "the defendant failed to save the Government from having to prepare for trial." *Id*. However, the work of preparing for trial is precisely the burden the Sixth Amendment places on the government should it wish to deprive someone of his or her liberty. A three point increase in the prospective Guidelines' range is a substantial penalty that places undue pressure on a defendant's exercise of his Sixth Amendment right, particularly where the decision to apply one of those points is left entirely in the government's discretion. *Id*. at *5. Because § 3E1.1 unconstitutionally burdens Mr.

19

Walker's right to trial under the Sixth Amendment, it was error for the PSR not to include a 3-point reduction in total offense level.

X.      **Conclusion**

For the reasons discussed above, the court should find the PSR incorrectly calculated the Sentencing Guidelines applicable to this case.

Dated: May 15, 2025
        Hagåtña, Guam                                  Respectfully submitted,

                                                        **DENTONS US LLP**

                                                        _/s/ Steven R. Welk_
                                                        Steven R. Welk
                                                        4675 MacArthur Court
                                                        Suite 1250
                                                        Newport Beach, CA 92660
                                                        United States
                                                        P: (949) 732-3700
                                                        F: (949) 732-3739
                                                        steven.welk@dentons.com
                                                        Admitted _Pro Hac Vice_

                                                        **LAW OFFICE OF VANESSA L. WILLIAMS, P.C.**

                                                        _/s/ Vanessa L. Williams_
                                                        VANESSA L. WILLIAMS
                                                        414 West Soledad Avenue
                                                        GCIC Bldg., Suite 500
                                                        Hagåtña, Guam 96910
                                                        P: (671) 477-1389/ (671) 777-5689
                                                        service@vlwilliamslaw.com

                                                        _Attorneys for Defendant John D. Walker_

20